***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to joinder or non-joinder of parties.
4. An employee-employer relationship existed between plaintiff and defendant-employer.
5. Plaintiff alleges to have sustained a compensable injury on July 2, 1999.
6. On November 9, 1999, plaintiff was deemed to be at maximum medical improvement with a permanent partial impairment rating of five percent (5%) to her right fifth finger and a thirteen percent (13%) disability to her right ring finger by Steven St. Clair, M.D.
7. On February 8, 2000, plaintiff was deemed to be at maximum medical improvement with a permanent partial impairment rating of six percent (6%) to her right hand by Mark E. Brenner, M.D.
8. On February 8, 2000, plaintiff was released with restrictions of avoiding repetitious pushing, pulling, gripping, pinching and fingering and avoiding production related activity demand.
9. Plaintiff was paid for the entire day of the alleged incident.
10. Defendants have paid $25,359.00 in indemnity benefits and $6,401.00 in medical expenses through March 2, 2001.
11. Plaintiff average weekly wage is $406.13 resulting in a compensation rate of $270.77 based upon a Form 22 dated August 6, 1999.
12. The depositions of Joseph P. Appollo, Ph.D., Stephen Carpenter and Randy Gore are a part of the evidentiary record.
13. The parties stipulate into evidence the following documents:
1. Medical records of FirstHealth Montgomery Hospital
2. Medical records of Pinehurst Surgical Clinic, P.A.
3. Medical records of B. McNeese, FNP
4. Steven St. Clair, M.D. independent medical evaluation report
 5. Letter from Mark E. Brenner, M.D. dated February 8, 2000 to Rosa Britt, R.N.
6. Form 22 dated August 6, 1999.
7. All Industrial Commission Forms
8. Foundry Service Company Job Description for Finish Grinder
9. Foundry Service Company Job Description for Special Gauge
 ***********
Based upon the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 32-year-old single mother who sustained a compensable injury on or about July 2, 1999. She completed eighth grade and has not obtained a GED. Plaintiff went to work at Foundry Service Company in June 1998 as a second shift finish grinder.
2. During the first seven months of her employment, plaintiff received positive progress reports, some of which resulted in pay increases. The employee progress reports rated employees in five categories, one of which is production. Although defendant-employer states there is no production requirement, the employee progress reports indicate that production was considered with regard to pay increases. Plaintiff's job required her to lift parts weighing between two and five pounds and to use air-operated hand tools to clean excess fin off castings. The air tools were operated by gripping and depressing a trigger.
3. Plaintiff began to experience pain in her right hand in February 1999. Plaintiff reported hand pain to her supervisor, who was Raphael Pena at that time. Mr. Pena indicated to plaintiff that the pain might resolve and suggested that she wait to see if the pain continued the next day. Plaintiff continued to work with a locked trigger finger until July 1999 when she reported the pain to Clarence Dorsett and he instructed her to go to the emergency room. Plaintiff first sought medical treatment at the Emergency Room on July 6, 1999. Plaintiff returned to the Emergency Room on July 15, 1999 with right hand and wrist pain as well as pain radiating in the right shoulder and lower back. Plaintiff was diagnosed with trigger finger and her right ring finger was splinted and she was given pain medication.
4. Plaintiff was referred to Dr. Ward Oakley for further treatment. Plaintiff first visited Dr. Oakley on July 7, 1999. Dr. Oakley diagnosed right trigger finger, prescribed a brace and released plaintiff to return to light work with restrictions to her right hand of no repetitive motion or strenuous use such as gripping for three weeks.
5. On July 17, 1999, Dr. Oakley recommended a right trigger finger release which was performed at Moore Regional Hospital Ambulatory Surgical Center on July 29, 1999. On August 9, 1999, Dr. Oakley released plaintiff to return to work effective August 23, 1999 with restrictions of no lifting or carrying over 20 pounds and no repetitive gripping or bending of the wrist.
6. Defendant-employer alleges that when a copy of plaintiff's medical release to return to work was received, plaintiff was contacted on three occasions to determine whether she would return to work. Defendant-employer alleges leaving three telephone messages for plaintiff who never returned the calls, never contacted her supervisor, and never returned to work. Therefore, plaintiff was considered to have voluntarily quit per company policy since she had failed to call in to work after being out of work for three days. Plaintiff testified that she called defendant-employer on August 23, 24 and 25, 1999 and was told by the receptionist that Mr. Jackson was not available or was in a meeting so plaintiff left a message. Plaintiff is credible in light of the testimony of Ms. Amy DeBerry regarding plaintiff's veracity and the contradictory statements offered by defendants regarding the availability of work within plaintiff's restrictions.
7. As of August 23, 1999, defendant-employer contends that jobs suitable and within plaintiff's restrictions were available. However, Amy DeBerry, plaintiff's food stamp caseworker, called defendant-employer on August 27, 1999 to verify that plaintiff had not returned to work and was told by Gary Reynolds that there was no work that fits the light duty description requested by plaintiff's doctor. Defendants' assertion that suitable employment was available is given little weight in light of defendant-employer's statement to Ms. DeBerry.
8. On September 17, 1999, Dr. Oakley indicated that plaintiff had a nerve conduction study which was positive for carpal tunnel syndrome, most likely related to a work injury. Dr. Oakley did not state that it was a result of plaintiff's employment with defendant. He indicated, however, that any other chronic nonspecific wrist pain would not be due to her work condition based upon the fact that plaintiff did similar type of repetitive work for five years and had no trouble and was unresponsive to a non-work condition.
9. On November 11, 1999, plaintiff underwent an Independent Medical Evaluation with Dr. Stephen St. Clair. Regarding the cause of plaintiff's bilateral carpal tunnel syndrome Dr. St. Clair indicated that the severity of the carpal tunnel syndrome, its symmetric nature, and the relatively short time plaintiff had worked with defendant-employer showed a strong likelihood that plaintiff had significant nerve conduction slowing prior to working for defendant-employer. In fact, it is highly likely that plaintiff had asymptomatic carpal tunnel syndrome prior to beginning her work there. Dr. St. Clair indicated that there was no current contribution of plaintiff's recent work activities with defendant-employer to her current left carpal tunnel syndrome. With regard to the right hand, Dr. St. Clair indicated it was likely that she also had asymptomatic carpal tunnel syndrome before beginning work defendant-employer and that it was quite possible that none of her current symptoms were attributable to carpal tunnel syndrome. He further stated that it was possible that plaintiff's work activities for defendant-employer aggravated her underlying carpal tunnel syndrome in her right hand.
10. Dr. St. Clair rated plaintiff with a five percent (5%) permanent partial impairment of her right fifth digit and with a 13 percent (13%) permanent partial impairment of her right fourth digit. Dr. St. Clair indicated plaintiff is restricted from highly repetitive job tasks, regardless of treatment or even symptom improvement. He also recommended that she not be placed in a job with activities requiring repetitive use of either hand on a permanent basis, with recommended restrictions to include no forceful gripping, no heavy or forceful lifting, no extremes of flexion or extension at the wrist and no vibration exposure. Dr. St. Clair indicated that plaintiff's permanent restrictions involving her right and left hands and right wrist are related to the presence of plaintiff's preexisting condition.
11. Furthermore, with respect to the hands and right wrist, plaintiff was not at maximum medical improvement according to Dr. St. Clair. Consequently, a rating was not appropriate.
12. On December 10, 1999, plaintiff returned to Dr. Oakley for the first time since September. Dr. Oakley indicated that the work-relatedness of plaintiff's conditions had not yet been determined. Dr. Oakley referred plaintiff to his associate, Dr. Brenner, a hand specialist.
13. On December 22, 1999, Dr. Brenner found the three view x-rays of plaintiff's hand within normal limits. Despite positive nerve conduction studies, Dr. Brenner did not recommend further surgery and instead recommended occupational therapy. Plaintiff's signs and symptoms were not consistent with classical carpal tunnel syndrome. Dr. Brenner felt that plaintiff retained the ability to work on a full-time basis, but that restrictions concerning repetitive over-use would be appropriate.
14. On February 8, 2000, Dr. Brenner determined plaintiff to be at maximum medical improvement with a six percent (6%) permanent partial impairment of her right hand as a function of her vocational trauma. He indicated long-term ergonomic restrictions would include avoiding repetitious pushing, pulling, gripping, pinching, and fingering and the avoidance of production related activity demands. He further indicated that while plaintiff's nerve conduction studies were positive for carpal tunnel syndrome, clinically this did not correlate with her symptoms. Dr. Brenner continued to recommend against surgery. However, plaintiff continues to have pain in her right hand.
15. On February 8, 2000, Dr. Brenner felt that "vocational rehabilitation might be considered in the near future."
16. In March 2000, defendant-carrier requested vocational services from CorVel Corporation and Stephanie Mitchell was assigned as plaintiff's vocational counselor. The initial meeting was April 18, 2000.
17. On May 4, 2000, Ms. Mitchell, the vocational counselor, met with plaintiff and her attorney to review the test results from the previous meeting and to target some potential occupations such as hostess, security, clothes tagger, and flower shop counter clerk.
18. On May 18, 2000, Ms. Mitchell met with plaintiff and discussed Montgomery Community College explaining that returning to school and obtaining a GED would be a good goal for plaintiff. Ms. Mitchell had difficulty conducting this meeting with plaintiff because of the participation of plaintiff's attorney in rephrasing and answering plaintiff's questions.
19. Ms. Mitchell provided plaintiff with information regarding adult education classes at Montgomery Community College and reminded plaintiff of the upcoming meeting scheduled for June 6, 2000. On that same date, Ms. Mitchell advised plaintiff's attorney by letter that she had received authorization to set up a cab account to assist plaintiff with a means of transportation for her job search and her adult education classes at Montgomery Community College. Ms. Mitchell also indicated that direct placement activities were also underway.
20. On June 5, 2000, Ms. Mitchell prepared an Individualized Rehabilitation Plan for plaintiff.
21. On June 15, 2000, Ms. Mitchell conducted a conference call with plaintiff and her attorney. At that time, plaintiff's attorney advised that plaintiff would pursue her GED or a job search, but not both. The case manager advised that she would perform the job search. Plaintiff's attorney objected stating that plaintiff could continue her GED even if she found work.
22. Shortly thereafter, Ms. Mitchell sent letters to plaintiff and her attorney regarding transfer of plaintiff's case to another case manager. Vocational rehabilitation has not been fully explored due to these difficulties.
23. On June 7, 2000, CorVel Case Manager James Soder wrote to plaintiff's attorney indicating that he felt that plaintiff's attorney had been hostile on the telephone. Mr. Soder indicated that he had been assigned to plaintiff's file and expected to set up an appointment very soon. Mr. Soder asked that plaintiff's attorney contact him within 20 days.
24. On June 26, 2000, Mr. Soder called plaintiff's attorney and followed up with a letter of June 27, 2000. Several attempts by Mr. Soder to engage plaintiff's attorney and plaintiff had failed. Plaintiff's attorney refused to allow another case manager to be involved.
25. Shortly thereafter, the Commission approved the transfer of plaintiff's file to another case manager.
26. On October 6, 2000, Mr. Soder wrote a letter to plaintiff with a copy to her attorney indicating that he had attempted to reach plaintiff by telephone several times as well as contacting plaintiff's attorney's office to obtain an updated phone number. Mr. Soder asked plaintiff to contact him within seven days from the date of the October 6, 2000 letter; however, plaintiff never contacted Mr. Soder.
27. On October 10, 2000, Mr. Soder was given one day's notice that plaintiff would be available for interview when plaintiff's attorney called and left a message at the main CorVel office. Plaintiff's attorney did not contact Mr. Soder at either of his direct numbers, which would have been more efficient and indicative of a good faith effort to cooperate.
28. As of November 15, 2000, plaintiff had not responded to the certified letter from Mr. Soder and remained non-cooperative. Furthermore, plaintiff had made no direct contact with Mr. Soder. On November 30, 2000, defendant-carrier requested the case be closed as a result of plaintiff's failure to cooperate with vocational service. However, defendants did not seek termination of plaintiff's benefits through the Commission.
29. Plaintiff's testimony that she had no transportation for work or for vocational services is given little weight. Plaintiff testified that she drove to work every day prior to the hand problems and Ms. Mitchell, plaintiff's prior case manager, was arranging transportation services through a local cab company to enable plaintiff to attend vocational services.
30. According to the testimony of Mr. Carpenter and of Joseph P. Appollo, Ph.D., plaintiff's experts, their testing of plaintiff indicates deficiencies in plaintiff's cognitive abilities. Mr. Carpenter stated that pursuing a GED would be beneficial to plaintiff and could provide some cognitive rehabilitation. Mr. Carpenter also suggested a sheltered workshop setting may improve plaintiff's cognitive abilities and communication skills. This vocational rehabilitation approach would benefit plaintiff and possibly return her to the work force despite her right upper extremity limitations and cognitive abilities.
31. Plaintiff is not permanently and totally disabled, especially in light of the fact that plaintiff has not put forth a reasonable effort to cooperate with vocational rehabilitation nor has she shown that she has been unsuccessful in her effort to obtain employment. Furthermore, plaintiff's attorney has failed to participate in the spirit of the Commission's rules concerning vocational rehabilation.
 ***********
Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident to her right hand resulting in trigger finger. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to prove by the greater weight of the evidence that she is permanently and totally disabled at this time. N.C. Gen. Stat. § 97-29; Russell v. Lowes Prod. Distrib., 108 N.C. App. 762,425 S.E.2d 454 (1993).
3. Plaintiff is entitled to continue to receive total disability compensation in the amount of $270.77 per week until plaintiff returns to work at the same or greater wages or further order of the Commission. N.C. Gen. Stat. § 97-29.
4. Subject to the limitations of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to have defendants pay for all medical treatment and vocational rehabilitation services that are reasonably necessary to effect a cure, provide relief or lessen plaintiff's disability as a result of her compensable injury. N.C. Gen. Stat. §§ 97-25.1; 97-25.
5. Plaintiff would benefit from reasonable vocational rehabilitation services. However, plaintiff has failed to cooperate with past vocational rehabilitation efforts and plaintiff's attorney has not participated in the spirit of the Commission rules concerning vocational rehabilitation. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission adopts and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff's claim for permanent and total disability must be and the same is hereby DENIED. However, subject to a reasonable attorney's fee, defendants shall continue to pay plaintiff total disability compensation at the rate of $270.77 per week until plaintiff returns to work at the same or greater wages or further order of the Commission.
2. Defendants shall pay all medical and vocational expenses related to plaintiff's compensable injury for so long as such treatment may be reasonably necessary to effect a cure, give relief or lessen plaintiff's disability, when bills for the same have been submitted in accordance with Industrial Commission procedure.
3. Plaintiff shall fully cooperate with the vocational rehabilitation services including but not limited to reasonably making and meeting appointments and reasonably following program plans. Furthermore, plaintiff's attorney shall participate in accordance with the spirit of the Commission's rules concerning vocational rehabilitation. Plaintiff's future failure to cooperate with vocational efforts will result in termination of plaintiff's total disability compensation. Defendants shall provide vocational rehabilitation for plaintiff including assigning a new vocational rehabilitation case manager to work with plaintiff.
4. Plaintiff shall be responsible for the expert witness fees of Stephen Carpenter and Joseph Appollo, Ph.D.
5. An attorney's fee in the amount of twenty-five percent of the compensation due plaintiff herein is hereby awarded for plaintiff's attorney to be deducted by paying every fourth compensation check directly to plaintiff's attorney.
6. Defendants shall bear the costs due the Commission.
This the ___ day of March 2002.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER